**SIERRA CLUB, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, Defendant.**

Civ. A. No. 89–B–181.

United States District Court,
D. Colorado.

Aug. 13, 1991.

Adam Babich, Denver, Colo., for plaintiff.

Mary Elizabeth Ward, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., William G. Pharo, Asst. U.S. Atty., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Plaintiff Sierra Club brings this citizen enforcement action to abate alleged violations of the Resource Conversation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6991i, at the Rocky Flats Nuclear Weapons Plant (Rocky Flats) in Jefferson County, Colorado. The amended complaint alleges that defendant United States Department of Energy (DOE) is managing hazardous waste at Rocky Flats in violation of RCRA.

In November, 1989, DOE halted plutonium processing operations at Rocky Flats. DOE plans to begin a phased in resumption of those operations in October, 1991. Before me is Sierra Club's motion for a permanent or preliminary injunction prohibiting DOE from restarting Rocky Flats in violation of RCRA's permit requirements. The parties pleadings and papers, and the hearing held August 6, 1991, show no genuine dispute as to the material facts. Thus, a final order may enter without trial.

I hold that DOE can store newly generated hazardous waste in compliance with RCRA's permit requirement. Consequently, I will not issue an injunction prohibiting DOE from restarting Rocky Flats. However, I further hold that, under the totality of the circumstances of this case, DOE's admitted violations of RCRA's permit requirement regarding other hazardous waste mandates issuance of a permanent injunctive order that DOE comply with RCRA by obtaining within twenty-four months a permit for that waste now stored illegally. If DOE fails to comply with this order, subject to certain exceptions, it must cease plutonium processing operations at Rocky Flats.

## I. STATUTORY BACKGROUND

Congress enacted RCRA to promote the protection of human health and the environment and to conserve valuable resources by providing for comprehensive regulation of hazardous waste. *See* 42 U.S.C. § 6902(a). If hazardous waste is generated, it "should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). Because "the placement of inadequate controls on hazardous waste management will result in substantial risks to human health and the environment," 42 U.S.C. § 6901(b)(5), RCRA and its implementing regulations establish a cradle-to-grave regulatory scheme for hazardous waste management. 42 U.S.C. §§ 6901–6991i; 40 C.F.R. Pts. 260–80.

The United States Environmental Protection Agency (EPA) is charged, in the first instance, with RCRA's administration. However, EPA may authorize a state to implement its own program "in lieu of" the federal program, if the state program is "equivalent to" and "consistent with" the federal program. 42 U.S.C. § 6926(b). Once authorized, the state's regulatory program applies in lieu of the federal regulatory program. *Id.* EPA has authorized the State of Colorado to administer its hazardous waste program "in lieu of" the federal program. 49 Fed.Reg. 41036 (Oct. 19, 1984); *see also* 54 Fed.Reg. 20847 (May 15, 1989) (authorizing Colorado to administer the 1989 amendments to RCRA). Colorado's regulations are substantially similar to those of the EPA. In Colorado, RCRA is enforced by the Colorado Department of Health (CDH).

RCRA requires all facilities treating, storing, or disposing of hazardous waste (TSD facilities) to obtain a permit. 42 U.S.C. § 6925(a). However, a generator of hazardous waste may accumulate up to 55 gallons of hazardous waste in containers at or near the point of generation without a permit. C.F.R. § 262.34(a) & (c); 6 Colo. Code Regs. § 262.34(a) & (c). A TSD facility that was in existence on or before November 19, 1980, or the effective date of statutory or regulatory changes under RCRA that render that facility subject to RCRA, can "be treated as having been issued a permit until such time as final administrative disposition of such application is made...." 42 U.S.C. § 6925(e)(1). Facilities treated as having been issued a permit are deemed to have "interim status." 42 U.S.C. § 6925(e).

To qualify for interim status, a TSD must complete certain steps. First, it must submit a Notification of Hazardous Waste Activity to EPA or the authorized state by August 19, 1980, or within 90 days of the changes that first subject the facility to regulation. 42 U.S.C. § 6930(a); 40 C.F.R. § 270.1(b); 6 Colo.Code Regs. Pt. 99. Second, the facility must submit "Part A" of a permit application by November 19, 1980, or by the effective date of the changes in the law that first subject the facility to regulation. 42 U.S.C. § 6925(a) & (e); 40 C.F.R. § 270.1(b); 6 Colo.Code Regs.

§ 100.11(1990) (within six months of the date of publication). The second part of the application, "Part B," is due when requested by EPA or the authorized state, or otherwise as required by RCRA. 42 U.S.C. § 6925; 40 C.F.R. §§ 270.1(b), 270.14; 6 Colo.Code Regs. §§ 100.11(b)(1) (within six months from date of CDH request unless longer period granted), 100.41.

While operating under interim status, a TSD facility is subject to EPA or state regulations, including facility requirements. 40 C.F.R. Pt. 265; 6 Colo.Code Regs. Pt. 265. These regulations contain numerous protections, including design requirements for storage facilities, separation of incompatible wastes, security procedures, personnel training, and routine inspections. However, because they apply to a wide variety of TSD facility, the regulations are necessarily generic. A permit insures more effective safeguard of human health and the environment because it can be tailored narrowly to the particular facility. The permit is the linchpin of RCRA's regulatory scheme.

Federally owned TSD facilities are subject to all RCRA requirements, "including any requirement for permits or ... any provision for injunctive relief...." 42 U.S.C. § 6961. However, "[t]he President may exempt any [executive branch TSD facility] from such a requirement if he determines it to be in the paramount interest of the United States to do so." *Id.*

## II. UNDISPUTED FACTS

Rocky Flats is part of a system of federally-owned laboratories and plants that, in the interest of national defense, develop, produce, and maintain this nation's stockpile of nuclear weapons. It is the only facility capable of large scale manufacture of plutonium "pits," which are the essential element of fission triggers in thermonuclear weapons. Rocky Flats recovers plutonium from retired weapons and produces new pits for existing or new weapons. It is located approximately 16 miles northwest of Denver, Colorado and between 9 and 12 miles from the Colorado communities of Golden, Boulder, Broomfield, and Westminster.

When operating, Rocky Flats generates radioactive constituents mixed with hazardous waste, including transuranic wastes (greater than 100 nanoCuries of transuranic elements per gram) (TRU-mixed wastes) and "mixed residues." "Transuranic" refers to plutonium and other elements with an atomic number higher than that of uranium. Although mixed residues contain more than 100 nanoCuries of transuranic elements per gram, DOE long refused to classify them as wastes because they contain sufficient concentrations of plutonium to warrant further plutonium recovery. Some mixed residues are combustible and were previously incinerated in the Special Nuclear Material Recovery Incinerator (the incinerator) in Building 771 at Rocky Flats. However, because the incinerator is no longer functioning, no incineration in Building 771 will take place should plutonium processing operations resume.

In July, 1986, EPA issued a notice that RCRA applies to mixed radioactive and hazardous waste. 51 Fed.Reg. 24504 (July 3, 1986). Two years later, EPA announced that it would treat the notice as if it were a regulatory change, thus, allowing facilities such as Rocky Flats to gain interim status. 53 Fed.Reg. 37045, 37046–47 (September 23, 1988). CDH followed EPA's determination that RCRA applies to mixed radioactive and hazardous waste.

By previous order, I rejected DOE's position that its "mixed residues" were not subject to RCRA and held that: (1) all substances listed at 40 C.F.R. Part 261, Subpart D or possessing characteristics set forth at 40 C.F.R. Part 261, Subpart C, and that defendants have burned in an incinerator or are storing pending treatment in a plutonium recovery process are RCRA Subtitle C hazardous wastes; (2) all substances (except plutonium) mixed with listed hazardous wastes are RCRA Subtitle C hazardous wastes; and (3) all residues (except plutonium) from incineration or other treatment in a plutonium recovery process of hazardous wastes are RCRA Subtitle C hazardous wastes. *Sierra Club v. United*

*States Dep't of Energy,* 734 F.Supp. 946, 947 (D.Colo.1990).

Despite this holding, DOE never obtained interim status or a permit for these "mixed residues." DOE is storing 599.5 cubic yards of mixed residues at Rocky Flats. The storage of these mixed residues results in an undetermined quantity of carbon tetrachloride being vented into the atmosphere. Under the 1990 Clean Air Act amendments, carbon tetrachloride is classified as a "hazardous air pollutant." 42 U.S.C. § 7412(b)(1). Those amendments also required EPA to list carbon tetrachloride as a substance that "causes or contributes significantly to harmful effects in the stratospheric ozone layer." 42 U.S.C. § 7671a(a).

On August 9, 1989, CDH issued a Notice of Violation concerning these mixed residues. On November 3, 1989, DOE and CDH entered into a Settlement Agreement and Compliance Order (November 1989 order), which established a system for identification, characterization, classification, and management of the mixed residues. In particular, this order required DOE to submit a Residue Compliance Plan by September 28, 1990 (the plan).

On July 31, 1991, CDH issued a Compliance Order, finding that the plan was inadequate in several respects and violated the November 1989 order. The July 31 order requires DOE to submit a report by February, 1992 with a schedule that provides for mixed residues being stored in areas that do not have a permit or interim status to be removed from Rocky Flats by January 1, 1999. On August 1, 1991, CDH filed a complaint in this court, alleging that DOE had submitted an inadequate plan in violation of the November 1989 order. *Colorado v. United States Dep't of Energy,* No. 91–B–1326 (D.Colo.). In that action, CDH seeks an order directing DOE to meet the terms of the July 31, 1991 order. Although I denied without prejudice CDH's motion to consolidate these two actions, I allowed CDH to appear amicus curiae and present argument at the August 6 hearing. At the August 6 hearing, DOE admitted that it is storing these mixed residues in violation of RCRA.

Exhibit A to the Settlement Agreement and Compliance Order on Consent No. 89–07–10–01 granted DOE interim status for certain TRU-mixed waste storage units. This document provides in part:

a. [T]he Director determines that all TRU-mixed waste units included in applications filed by July 1, 1988, have interim status except for unit 60 (Building 371, Room 1208).

b. The total capacity limit for interim status container storage for TRU-mixed waste shall be [1601 cubic yards (the 1601 limit)].

DOE is storing approximately 1092.5 cubic yards of TRU-mixed waste at Rocky Flats, apparently at locations that have interim status.

In November 1989, plutonium processing operations at Rocky Flats were essentially stopped. DOE has announced plans to begin a phased in resumption of those operations beginning as early as October 1, 1991. Specifically, DOE plans first to resume activities in Building 559, which is an analytical laboratory. The next building in which operations are proposed to resume is Building 707, which is not scheduled to resume operations until December, 1991, at the earliest. No estimate of quantity of newly generated hazardous waste was given except for Building 559.

If operations are resumed at Building 559, DOE anticipates that one to three 55-gallon drums of containerized combustible mixed residues will be generated on a monthly basis. DOE also contemplates generation of approximately 40 gallons of liquid mixed residues per month.

DOE plans to store all of the newly generated combustible mixed residues and 90% of the newly generated liquid mixed residues in the TRU-mixed waste storage units that have interim status. The remaining ten percent of the newly generated combustible mixed residues, approximately four gallons per month, will be stored in satellite accumulation areas that have neither a permit nor interim status.

## III. DISCUSSION

Generally, to obtain an a permanent injunction, the movant must show: (1) success on the merits; (2) it will suffer irreparable injury if the injunction does not issue; (3) the threatened injury to it outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction will not be adverse to the public interest. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980); *see also Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987).

As to Sierra Club's request for an injunction prohibiting the restart of Rocky Flats, success on the merits means showing that newly generated mixed residues will be stored in violation of RCRA's permit requirement. Much of the parties extensive briefing in this case has focused on whether, upon such a showing, an injunction should issue without proof of irreparable harm. I conclude that Sierra Club has not shown success on the merits because DOE can store *newly generated* mixed residues without violating RCRA's permit requirement. Accordingly, I deny Sierra Club's request for an injunction prohibiting the restart of Rocky Flats without addressing the irreparable harm question.

Although Sierra Club cannot meet its burden to enjoin the restart of Rocky Flats, it has shown that DOE is storing 599.5 cubic yards of mixed residues in violation of RCRA. Precedent permits me to order DOE to comply with RCRA's permit requirement without a showing of irreparable harm. Given DOE's longstanding disregard of RCRA's permit requirement and the lack of adequate legal remedy, I will order DOE to comply with RCRA by obtaining a permit for the illegally stored mixed residues within two years from the date of this order. To assure compliance with this order, I also order that plutonium processing at Rocky Flats must cease if DOE does not obtain its permit within two years.

### A. Enjoining the Restart of Rocky Flats

■ I first consider whether to prohibit DOE from restarting Rocky Flats. Sierra Club argues that either a preliminary or permanent injunction prohibiting Rocky Flats' restart is necessary because DOE has no place to store legally the newly generated mixed residues. Because I conclude that DOE may store legally the newly generated mixed residues up to the present 1601 limit, I deny this request for injunctive relief.

Initially, I consider the ten percent of liquid mixed residues that DOE plans to store in satellite accumulation areas that have neither a permit nor interim status. These mixed residues will amount to approximately 4 gallons per month. As discussed above, a generator of hazardous waste may accumulate up to 55 gallons of waste in containers at or near the point of generation without a permit. 6 Colo.Code Regs. § 262.34(a) and (c). Accordingly, DOE can accumulate up to 55 gallons of newly generate liquid mixed residues in satellite accumulation areas without violating RCRA's permit requirement.

I next consider whether DOE may store legally the newly generated mixed residues and 90% of liquid mixed residues in TRU-mixed waste storage locations that have interim status. DOE argues that this storage will not violate RCRA's permit requirement. I agree.

■ The only difference between TRU-mixed waste and mixed residues is that mixed residues contain a higher concentration of plutonium. However, plutonium is not a substance regulated by RCRA. Thus, under RCRA, there is no operative distinction between TRU-mixed waste and mixed residues—the hazardous substances otherwise contained in each are the same. DOE's interim status to store TRU-mixed waste at designated locations necessarily allows storage of newly generated mixed residues at those locations because, for the purposes of RCRA, TRU-mixed waste and mixed residues are the same.

Sierra Club argues that even if this is so, the newly generated mixed residues will nevertheless be stored illegally because DOE's total allowed storage of mixed resi-

dues and TRU-mixed waste at the plant already exceeds the 1601 limit (599.5 + 1092.5 = 1692.0). Therefore, Sierra Club asserts that DOE can store legally no more TRU-mixed waste or mixed residues at Rocky Flats. Sierra Club's argument is premised on its assumption that DOE may store legally only 1601 cubic yards of TRU-mixed waste plant-wide. To the contrary, DOE argues that the 1601 limit applies only to waste stored in the TRU-mixed waste storage locations that have interim status. CDH concurs with DOE's interpretation. I also agree with DOE.

First, CDH's interpretation of its own order is entitled to some deference. Even absent such deference, I adopt DOE's and CDH's interpretation of the 1601 limit.

As stated above, the document establishing the 1601 limit provides in pertinent part:

    a. [T]he Director determines that all TRU-mixed waste units included in applications filed by July 1, 1988, have interim status except for unit 60 (Building 371, Room 1208).

    b. The total capacity limit for interim status container storage for TRU-mixed waste shall be [1601 cubic yards].

CDH did not limit the total capacity for plant-wide storage of TRU-mixed waste but only the total capacity "for interim status container storage...." Thus, the 1601 limit applies only to storage units with interim status and not to those without interim status. Moreover, CDH knew of the mixed residues being stored without interim status and chose to deal with those hazardous wastes separately. *See* Settlement Agreement and Compliance Order on Consent No. 89-10-30-01. If CDH intended the mixed residues stored without interim status to be included in the 1601 limit it would not have applied the limit to only "interim status container storage."

Additionally, one must read paragraph b in *pari materia* with paragraph a. Because paragraph a relates to designated storage areas that were granted interim status, it follows that paragraph b, and the 1601 limit, also relates to those designated locations. Finally, Sierra Club misinterprets "the limit for interim status container storage" to also limit *non-*interim status container storage.

I conclude that the 1601 limit is location specific and applies only to hazardous waste stored in unit-areas that have interim status. Therefore, DOE can store newly generated mixed residues in those designated locations without violating the 1601 limit. Because DOE can store newly generated mixed residues without violating RCRA's permit requirement, Sierra Club's request for an injunction prohibiting Rocky Flats' restart is denied.

### B. Requiring DOE To Comply With The Law

■ Although Sierra Club has not established that DOE will illegally store newly generated mixed residues, Sierra Club has established that DOE is storing 599.5 cubic yards of existing mixed residues in violation of RCRA. I now consider the appropriate remedy for this violation.

As DOE finally admitted at the hearing, its storage of mixed residues without a permit or interim status violates RCRA. This violation has been longstanding. DOE has been obligated to obtain a permit, or interim status, at least since 1986 and probably since 1980.

In response to DOE's failure to even apply for interim status, CDH is now requiring DOE to remove the illegally stored mixed residues from Rocky Flats. However, at present, there is no facility in the country legally capable of storing this mixed hazardous and radioactive waste. Accordingly, CDH is giving DOE until 1999 to remove the mixed residues from the plant. In the meantime, CDH is requiring DOE to obtain a permit for storage of the mixed residues. As stated before, storage under permit is preferable because it allows for more rigorous and effective CDH control of the mixed residues' storage commensurate with RCRA's purpose.

Environmental statutes like RCRA, "permit[ ] the district court to order that relief it considers necessary to secure prompt

compliance with the Act." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982); *see* 42 U.S.C. § 6961. Thus, as DOE acknowledges, in an environmental case such as this, a district court may issue "an equitable order that would set a schedule for achieving compliance while allowing the activity at issue to continue or resume in the interim" without a showing of irreparable harm. DOE's Surreply at 3–4; *see Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 543 n. 8, 107 S.Ct. 1396, 1403 n. 8, 94 L.Ed.2d 542 (1987); *Romero–Barcelo*, 456 U.S. at 309, 102 S.Ct. at 1801–02; *United States v. Production Plated Plastics, Inc.*, 762 F.Supp. 722, 729 (W.D.Mich.1991).

Such an equitable order is necessary here to secure compliance with RCRA. DOE has been duty bound for years to obtain its permit. Nevertheless, the record in this case shows a constant pattern of delay and obfuscation. *Sierra Club*, 734 F.Supp. at 947–48.

For example, both the EPA and DOE speak through the United States Justice Department, presumably with one voice on behalf of all the people, and not for "the parochial interests of a particular agency." *See United States v. Providence Journal Co.*, 485 U.S. 693, 706, 108 S.Ct. 1502, 1510, 99 L.Ed.2d 785 (1988). However, in the face of its sister agency's determination that the waste at issue here is subject to RCRA, DOE persisted in its meritless claim to the contrary. *Sierra Club*, 734 F.Supp. 946.

The obfuscation is most recently exemplified by DOE's position regarding the illegally stored 599.5 cubic yards of previously generated mixed residues. Either this waste is stored illegally in its own right or it takes on illegal status when combined with the TRU-mixed waste that is subject to the 1601 limit. DOE argued that the previously generated mixed residues were not subject to the 1601 limit, but refused to acknowledge that those residues were stored illegally. DOE even quibbled with my previous determination that DOE lacked interim status for the previously generated mixed residues. DOE's Opposi-

tion to Sierra Club's Motion at 22 n. 17. Only on my questioning of government counsel at the August 6 hearing did DOE cease its circuitous reasoning and admit its undeniable RCRA violation.

DOE's demonstrated attitude is that it is a governmental agency that can avoid RCRA's mandates indefinitely with impunity. Congress clearly says otherwise. *See* 42 U.S.C. § 6961.

Perhaps DOE's attitude toward RCRA stems from the lack of teeth in RCRA's enforcement mechanisms vis-a-vis DOE. Sovereign immunity bars state imposed civil and criminal penalties in actions against the DOE. *Mitzelfelt v. Department of Air Force*, 903 F.2d 1293 (10th Cir.1990); *California v. Walters*, 751 F.2d 977 (9th Cir. 1984). Moreover, civil penalties in citizen enforcement actions are problematic. *Compare Ohio v. United States Dep't of Energy*, 904 F.2d 1058, 1064–65 (6th Cir. 1990) (sovereign immunity waived for civil penalties in RCRA citizen enforcement actions), *cert. granted*, —— U.S. ——, 111 S.Ct. 2256, 114 L.Ed.2d 709 (1991), *with id.* at 1068–69 (Guy, J., dissenting) (sovereign immunity not waived). Hence, Sierra Club no longer seeks civil penalties in this action. What remains, then, is for "the district court to order that relief it considers necessary to secure prompt compliance with the Act." *Romero–Barcelo*, 456 U.S. at 320, 102 S.Ct. at 1807.

At the hearing, CDH stated that it expects DOE to obtain a permit for the previously generated mixed residues in less than two years. Under the circumstances, two years is more than reasonable time for DOE to secure a proper permit.

42 U.S.C. section 6961 provides not only for injunctive relief, but also for "such sanctions as may be imposed by a court to enforce such relief. . . ." DOE's ongoing disregard for RCRA's linchpin permit process has been flagrant. Absent appropriate sanction, I have no credible reason to believe that DOE will comply with a two-year time requirement. Therefore, I conclude that nothing less than the threat of shutdown on noncompliance with this order will effectively enforce the requirement

that DOE obtain a RCRA permit for the mixed residues now stored in violation of RCRA.

Accordingly, it is ORDERED that:

(1) Sierra Club's motion for forthwith entry of a permanent injunction or, in the alternative, for preliminary relief prohibiting the restart of Rocky Flats is DENIED;

(2) Sierra Club's motion for forthwith entry of a permanent injunction is GRANTED in that:

(a) DOE shall obtain a permit for the mixed residues currently stored without a permit or interim status within two years from the date of this order;

(b) if within two years DOE does not obtain this permit, then DOE shall conduct no operations at Rocky Flats that generate any hazardous waste or mixed radioactive and hazardous waste;

(c) DOE may seek an exception to paragraph 2(b) of this order with respect to a specific operation, over a specific time period, if DOE demonstrates to this Court that it is in the paramount interest of the United States for Rocky Flats to operate illegally;

(d) DOE may seek an exception to paragraph 2(b) of this order with respect to a specific operation, over a specific time period, if DOE demonstrates to this Court that an exception is required to comply with a specific term of an enforceable order issued by the Colorado Department of Health or the U.S. Environmental Protection Agency under authority of an environmental protection law; and

(e) nothing in paragraph 2 of this order shall be construed to prohibit continued maintenance and safety activities required to maintain the safety of Rocky Flats in a non-operational status;

(3) this court shall retain jurisdiction to administer the terms of this order; and

(4) final judgment on this order shall enter.