**MORRISON & FOERSTER LLP, Plaintiff,**

v.

**Brian WICK and American Distribution Systems, Inc., Defendants.**

**No. CIV.A.00–B–465.**

United States District Court, D. Colorado.

April 19, 2000.

Roxanne Jensen, Tarek F.M. Saad, William R. Wade–Gery, Morrison & Foerster LLP, Denver, CO, for Plaintiff.

Ronald G. Rossi, Rossi & Maricle, P.C., Denver, CO, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER

BABCOCK, District Judge.

In this Internet action brought, inter alia, pursuant to the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"), Morrison & Foerster moves for a preliminary and permanent injunction. Defendants, Brian Wick and American Distribution Systems, Inc. ("ADSI"), oppose this motion. The issues are fully briefed. The parties stipulated to consolidation of the preliminary injunction hearing with a trial on the merits, and oral arguments were heard on March 30, 2000. For the reasons set forth below, I grant Morrison & Foerster's motion and find in favor of Morrison & Foerster. Federal question jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331.

### I. The World Wide Web

Before reciting the facts established by the evidence, I begin with a brief explanation of the relevant technology. The Internet, or the World Wide Web, is a network of computers that allows people to access information stored on other computers within the network. *See Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 492 (2d Cir.2000). "Information on the Internet is lodged on files called web pages, which can include printed matter, sound, pictures, and links to other web pages. An Internet user can move from one page to another with just the click of a mouse." *Id.* Web pages or web sites are designated by addresses called domain names.

A domain name is made up of two components: a top level domain and a secondary level domain. *See id.* The top level domain is the suffix of the domain name, and the Internet is primarily divided into six top level domains: "(1) .edu for educational institutions; (2) .org for non-governmental and non-commercial organizations; (3) .gov for governmental entities; (4) .net for networks; (5) .com for commercial users; and (6) a nation-specific domain, which is .us in the United States." *Id.* at 492. The secondary level domain is the remainder of the address, and can consist of letters, numbers, and some typographical symbols. Certain symbols, such as ampersands ( & ), cannot be used in a domain name. (Tr. Exh. 30, Register.com Domain Name Rules).

Web sites are used by many companies to provide product information and sell products online. Consumers need an easy way to find certain companies to order products or gather information. "The most common method of locating an unknown domain name is simply to type in the company name or logo with the suffix .com." *Sporty's*, 202 F.3d at 493. If this method is unsuccessful, a user can use a "search engine" which, theoretically, will find all web pages on the Internet containing a particular word or phrase.

Registrars assign domain names on a first-come, first-served basis upon pay-

ment of a registration fee. *See id.* Register.com, the registrar used in this case, charges $75.00 per domain name. Domain name registrars do not inquire into whether a domain name request matches or conflicts with another's trademark. *See id.* Lack of regulatory control caused problems of cybersquatting and cyberpiracy. *See id.* (citing *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316 (9th Cir.1998)). "Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Id.* Trademark owners are frequently willing to pay "ransom" in order to protect their marks. *See id.;* H.R.Rep. No. 106–412, at 5–7; S.Rep. No. 106–140, at 4–7 (1999).

The ACPA was passed in November 1999 to address these concerns, and to "protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as 'cybersquatting'." S.Rep. No. 106–140, at 4.

## II. Background

The following facts are established by the direct and circumstantial evidence. The law firm of Morrison & Foerster was founded in 1883. It has seventeen offices worldwide, with over 700 attorneys. Since 1975, Morrison & Foerster has provided legal services under the service mark, Morrison & Foerster. Since November 1991, Morrison & Foerster has owned and maintained United States Trademark Registration No. 1,665,352 for the mark MORRISON & FOERSTER for legal services. (Tr. Exh. 3, Cert. of Reg.). In 1997, the trademark office issued a Declaration of Use and Incontestability of a Mark under Sections 8 and 15, for the mark MORRISON & FOERSTER. (Tr. Exh. 28). In 1999, the firm's advertising and marketing budget was approximately $1 million.

Morrison & Foerster is the registered owner of the domain name *www.mofo.com.* Morrison & Foerster is commonly known in the legal community both as Morrison & Foerster and as "MoFo." The firm utilizes its Internet web site to market and promote its services, and to provide a point of contact for customers and attorneys seeking employment. In addition to owning the registered trademark MORRISON & FOERSTER, since December 1996 the firm has also owned the United States Trademark Registration No. 2,020,689 for the mark MOFO. (Exh. L to Dunham Decl., Cert. of Reg.).

On October 24, 1999, Mr. Wick, using the names NameIsForSale.com and Morri, Son & Foerster, registered the domain names *www.morrisonfoerster.com, www.morrisonandfoerster.com, www.morrisonforester.com,* and *www.morrisonandforester.com* through the online registrar, *www.register.com.* On October 27, 1999, Morrison & Foerster registered the domain names *www.morrisonfoerster.org, www.morrisonfoerster.net, www.morrisonandfoerster.net,* and *www.morrisonandfoerster.org.* At that same time, it attempted to register the domain names *www.morrisonfoerster.com* and *www.morrisonandfoerster.com.* Morrison & Foerster intended to establish web sites that would link to the firm's existing web site at *www.mofo.com.* However, because Mr. Wick already registered these domain names three days earlier, it was unable to do so.

According to *www.register.com* records, the administrative contact for *www.morrisonfoerster.com* and *www.morrisonandfoerster.com* was "Brian Wick, bgw@earthnet.net." (Tr. Exhs.15, 16). Under *www.register.com* rules, the admin-

istrative contact owns the domain name. (Registration Agreement ¶ 3). The other two domain names registered by Mr. Wick—*www.morrisonforester.com* and *www.morrisonandforester.com*—employ a common misspelling of Morrison & Foerster. The administrative contact for these domain names is also *"bgw@earthnet.net."* (Tr. Exh. 25). Registration records show that shortly before registering the four domain names at issue, Defendants registered *www.nameisforsale.com* as a domain name. According to *www.register.com*'s records, *www.nameisforsale.com* is registered by NameIsForSale.com, an entity that lists the same post office box address as Defendants Wick and ADSI, a Colorado corporation of which Mr. Wick is President, Secretary, registered agent, sole Director and sole Shareholder. Records also show that the administrative contact for the *www.nameisforsale.com* domain name is Brian Wick at *"bgw@earthnet.net."*

The four web sites at issue, established by Mr. Wick, are very different than Morrison & Foerster's official site at *www.mofo.com* . Although Mr. Wick's web sites displayed different things at different times, print outs of his sites state: "We're your paid friends!"; "Best friends money can buy"; "Greed is good!"; "We bend over for you . . . because you bend over for us!"; "Parasites No Soul . . . No Conscience . . . No Spine . . . . . . NO PROBLEM". (Tr. Exh. 22). Also on the web sites appeared a copy of a letter to Mr. Wick from Morrison & Foerster regarding infringement of the mark. (Tr. Exh. 22). Finally, the web sites contained hyperlinks which allowed a user to link on to other offensively named web sites, such as: *www.Lets DoSomeIllegalSteroids.com, www.GestapoTactics.com, www.Holocaust-Memorial.com, www.MightAsWellFireUp-TheOvens.com, www.JewKike.com, www.NoIrishNeedApply.com., www. NativeAmericansAreFinallyGettingTheir-LandBack.com, www.WhatExcuseDoWeG-*

*etToUseForTheNextColumbineHig hSchoolTragedy.com.* (Tr. Exhs.22, 37). Also listed as ADSI's "future web sites" were: *www.PillsBuryMadison.com, www.ProSkauerRose.com, www.SherManhoWard.com, www.GraHamJames.com.*

Morrison & Foerster's March 1, 2000 complaint states the following claims for relief:

(1) Cybersquatting in violation of the ACPA;

(2) Unfair Competition and False Designation of Origin in violation of 15 U.S.C. § 1125(a);

(3) Trademark Infringement in violation of 15 U.S.C. § 1114;

(4) Dilution in violation of 15 U.S.C. § 1125(c);

(5) Trademark Infringement & Unfair Competition;

(6) Intentional Interference with Current and Prospective Economic Advantage;

(7) Defamation; and

(8) Business Disparagement.

Morrison & Foerster's Motion for a Temporary Restraining Order and Preliminary Injunction was heard on March 9, 2000. I entered a Temporary Restraining Order and set bond at $280.00, pursuant to Mr. Wick's testimony that each site was worth $75.00. On March 30, 2000, I held a hearing on the Motion for Preliminary Injunction consolidated with a trial on the merits, pursuant to Rule 65(a).

### III. Standards for Injunctive Relief

Rule 65(a)(2) allows me to consolidate a preliminary injunction hearing with a trial on the merits:

(a) Preliminary Injunction.

.     .     .     .     .     .

(2) Consolidation of Hearing With Trial on Merits. Before or after the

commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. . . .

Fed. Rule Civ. Pro. 65. The parties stipulated to consolidation at the March 9, 2000 hearing and notice of the consolidation was given in my March 9, 2000 Order and sufficiently gave the parties a full opportunity to present their evidence. *See, e.g., Holly Sugar Corp. v. Goshen County Co-op. Beet Growers Ass'n,* 725 F.2d 564, 568 (10th Cir.1984). Whether to consolidate the hearing with the trial is within my discretion. *See, e.g., American Train Dispatchers Dept. of Intern'l Brotherhood of Locomotive Engineers v. Fort Smith R. Co.,* 121 F.3d 267, 269 (7th Cir.1997). Consolidation is proper in this case because the preliminary and permanent injunctions required the introduction of identical evidence. "[S]uch a consolidation generally saves considerable time at trial by eliminating unnecessary evidentiary redundancy." *Citizens Concerned for Separation of Church and State v. City and County of Denver,* 628 F.2d 1289, 1298 (10th Cir. 1980).

■ Because an injunction is an extraordinary remedy, "the right to relief must be clear and unequivocal." *United States v. Power Engineering . Co.,* 10 F.Supp.2d 1145, 1148 (D.Colo.1998) (citing *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991)). "A preliminary injunction is an equitable remedy that invokes the sound discretion of the district court." *Beerheide v. Zavaras,* 997 F.Supp. 1405, 1409 (D.Colo.1998). In determining whether to issue a preliminary or permanent injunction, a court must consider whether the movant has established: (1) success on the merits; (2) irreparable injury if the injunction does not issue; (3) the threatened injury to it outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction will not be adverse to the public interest. *See Power Engineering,* 10 F.Supp.2d at 1148–1149 (preliminary injunction) (citing *Chemical Weapons Working Group, Inc. v. United States Dept. of the Army,* 111 F.3d 1485, 1489 (10th Cir. 1997)); *Sierra Club v. United States Dept. of Energy,* 770 F.Supp. 578, 582 (D.Colo. 1991) (permanent injunction).

## IV. Anticybersquatting Consumer Protection Act

■ The Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"), amends the Trademark Act of 1946, creating a federal remedy for cybersquatting. 15 U.S.C. § 1125(d)(1)(A) reads:

(d) Cyberpiracy prevention

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A). The ACPA allows me to order "the forfeiture or cancel-

lation of the domain name or transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).

There is no dispute that Morrison & Foerster is the owner of the trademark MORRISON & FOERSTER. As noted above, it has owned this mark since November 1991. United States Trademark Registration No. 1,665,352. (Exh. C to Dunham Decl., Cert. of Reg.). In 1997, the trademark office issued a Declaration of Use and Incontestability of a Mark under Sections 8 and 15, for the mark MORRISON & FOERSTER. (Trial Exhibit 28).

Further, Morrison & Foerster's mark is distinctive and/or famous, and therefore entitled to the ACPA's protection. At the temporary restraining order hearing, I found that Morrison & Foerster's mark is famous and conclusively distinctive under the law. The mark has been used by Morrison & Foerster since 1991, has had millions of dollars in advertising spent on it, is used nationwide, and is registered with federal authorities. *See Sporty's,* 202 F.3d at 497 (citing 15 U.S.C. § 1125(c)(1)). Furthermore, in 1997, the trademark office issued a Declaration of Use and Incontestability of a Mark under Sections 8 and 15. (Tr. Exh. 28). Registration of Morrison & Foerster's mark entitles them to a "presumption that its registered trademark is inherently distinctive." *See id.* (citing *Equine Technologies, Inc. v. Equitechnology, Inc.,* 68 F.3d 542, 545 (1st Cir.1995)). Nothing presented at trial alters my conclusion that this mark is famous and distinctive.

I also conclude that Mr. Wick's four domain names are identical or confusingly similar to Morrison & Foerster's mark. Because ampersands cannot be used in Internet domain names (Tr. Exh. 30, Register.com Domain Name Rules), two of Mr. Wick's domain names are, in all practical aspects, identical to Morrison & Foerster's mark: *www.morrisonfoerster.com* and *www.morrisonfoerster.com. See id.; see, e.g., Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1055 (9th Cir.1999) (finding that the differences between the mark "MovieBuff" and the domain name "movie.buff.com" are "inconsequential in light of the fact that Web addresses are not caps-sensitive and that the '.com' top-level domain signifies the site's commercial nature."). His other two domain names employ a common misspelling of Morrison & Foerster's mark, and are, as he intended, confusingly similar: *www.morrisonforester.com* and *www.morrisonandforester.com.* (March 30, 2000 Trans. at p. 61).

The pivotal question is whether Mr. Wick "has a bad faith intent to profit" from his use of the mark. The ACPA provides assistance with this determination, stating nine factors for courts to consider in determining whether a defendant has acted with a bad faith intent to profit from the use of a mark:

(B)(i) In determining whether a person has a bad faith intent described under subparagraph (a), a court may consider factors such as, but not limited to

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the

domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i). Before introducing these nine factors, the ACPA states that a court "may" consider factors "such as" the ones listed. The factors therefore are not framed as exclusive or mandatory, see, e.g., Sporty's, 202 F.3d at 498, but are relevant guidelines.

First, it is clear that Mr. Wick has no intellectual property rights in any of the domain names he registered. Second, none of the domain names consist of Mr. Wick's legal name nor a name that he is commonly identified by. To the extent that he uses the trade name Morri, Son & Foerster, this has only been in use since January 3, 2000 when ADSI amended its corporate filings with the Colorado Secretary of State to include "Morri, Son & Foerster eBusiness, Inc." as an assumed name. This occurred several months after Defendants first acquired and used the domain names. See Sporty's, 202 F.3d at 499 (finding bad faith where defendant acquired related name several months after registration of domain name). Indeed, this conduct is indicative of Defendants' bad faith. Third, there is no evidence of Mr. Wick's prior use of any of these domain names in connection with the offering of any bona fide goods or services.

Directing my attention to the fourth factor, Mr. Wick argues that he uses the domain names merely to display "parody" web pages, making fun of Morrison & Foerster and the practice of law in general. He contends this is a bona fide noncommercial use of the mark. However, I conclude that use of Morrison & Foerster's trademark in this domain name would confuse the public and disparage the firm. I further conclude that this is not bona fide parody. See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 970 (10th Cir.1996) ("in the case of a good trademark parody, there is little likelihood of confusion, since the humor lies in the difference between the original and the parody."); OBH, Inc. v. Spotlight Magazine, Inc., 86 F.Supp.2d 176, 191 (W.D.N.Y.2000) ("Thus, even if users will easily recognize, upon reaching defendants' web site, that it is only a parody, the use of plaintiffs' mark as the site's domain name ... creates initial interest confusion"). I discuss parody and its First Amendment implications infra.

The fifth factor is clearly applicable here. Mr. Wick's use of Morrison & Foer-

ster's mark in his domain names demonstrates his intent to divert customers from Morrison & Foerster's online location. As stated by the Second Circuit in *Sporty's*, the most common method of locating an unknown domain name is simply to type in the company name or logo with the suffix.com. *Sporty's*, 202 F.3d at 493. Any user attempting to find Morrison & Foerster's web site in this manner, entering *www.morrisonandfoerster.com* or *www.morrisonfoerster.com*, would instead find Mr. Wick's web sites rather than the official Morrison & Foerster web site at *www.mofo.com*. Also, I conclude that if the public believed these to be Morrison & Foerster's sites, Mr. Wick's web sites would harm the goodwill represented by Morrison & Foerster's mark. As noted above, Mr. Wick's sites contain many hyper-links to Anti–Semitic, racist, and offensive domain names. Mr. Wick's sites refer to attorneys as parasites and are derogatory of the legal profession. Although some might profess to agree with Mr. Wick, the likelihood of confusion is great. Because Mr. Wick has placed his web sites at domain names identical or confusingly similar to Morrison & Foerster's mark, a user may wonder about Morrison & Foerster's affiliation with the sites or endorsement of the sites.

The sixth factor looks to Mr. Wick's offer to transfer or sell the domain name to the mark owner or to any third party for financial gain. In support of this factor, Morrison & Foerster points to Mr. Wick's use of the domain name *ww w.NameIsForSale.com*, in registering the web sites in question. Use of this name gives rise to reasonable inference of intent to sell the domain names for a profit. Further, the *ww w.NameIsForSale.com* homepage proudly states, "Name the property, product or service you want to donate, sell, buy, or rent. *Free matching service for donators, sellers, buyers and renters.*" (emphasis in original). Although Mr. Wick

testified that he never intended to use these web sites for profit (March 30, 2000 Trans at p. 93), his testimony is not credible in light of the nature of these webpages. I find it more likely than not that, as Mr. Wick himself admits, he had not yet had an opportunity to pursue financial gain from these domain names because he was too busy litigating these and similar matters. (March 30, 2000 Trans. at p. 96).

The seventh factor directs my attention to Mr. Wick's provision of material and misleading false contact information when applying for the registration of these domain names. Morrison & Foerster presented evidence at the March 30, 2000 trial that Mr. Wick failed to comply with *www.Register.com*'s rules for domain name registration. (Tr. Exh. 31, Register.com Registration Agreement). I view this failure as evidence of bad faith. Register.com lists several pieces of information that a subscriber is required to submit which, among other things, includes the user's name and postal address. In registering the at-issue domain names, Mr. Wick failed to provide his full name and his postal address. Instead, he provided a post office box and gave his e-mail address. (Tr. Exhs.13, 15, 16, 25). Further evidence of his intent to supply false contact information is that on March 15, 2000, after the Temporary Restraining Order was issued, Mr. Wick changed the contact name in his Register.com file. Listed as a contact had been, "ADSI c/o Morri, Son & Foerster." On March 15, Mr. Wick changed this to "DefaultData.com."

The eighth factor allows me to consider Mr. Wick's registration and acquisition of other domain names which he knows are identical or confusingly similar to marks of others that are distinctive at the time of his registration. Mr. Wick has registered the names of over ninety law firms, including: *www.HollandandHart.com*, *www.McKennaandCuneo.com*, *www.BakerandHostetler.com*, *www.HallandE-*

*vans.com.* (Tr. Exh. 41, pp. 1–2). All of these web sites are similar in appearance. Some reference "Parasites" and state "no soul ... no conscience ... no spine ... NO PROBLEM!!!" (Tr. Exh. 41, p. 3). Others claim, "We bend over for you ... because you bend over for us! As long as someone is bending over ... then someone is getting paid! Make sure you are bending over the right way! We tell you what you want to hear ... because you pay us! Greed is good!" (Exh. 41, p. 7). Needless to say, all of these web sites employ domain names which Mr. Wick knows are identical or confusingly similar to names of other law firms. And, as with Morrison & Foerster, these names and/or trademarks are distinctive and/or famous and, therefore, protected by the ACPA.

The ninth factor is the extent to which the mark incorporated into the domain name is or is not distinctive and/or famous. Because I have found Morrison & Foerster's mark to be both famous and distinctive, this factor weighs in its favor.

The most persuasive reason for concluding that Mr. Wick acted with bad faith intent does not fit neatly into the specific factors enumerated in the ACPA. I may nevertheless consider it under the statute. *See, e.g., Sporty's,* 202 F.3d at 499. Mr. Wick's own testimony demonstrates his bad faith. He testified that he began registering "parody" domain names to "get even" with a company he worked for that allegedly reneged on a contract with him. (March 30, 2000 Trans. at p. 89). When he had success in this limited field, he moved on to corporate America and, at one point, registered domain names for 7% of the Fortune 500 companies. (March 30, 2000 Trans. at p. 90). He then graduated to corporate recreation activities such as golf. (March 30, 2000 Trans. at p. 92). Finally, he began to register names of major law firms because they, in Mr. Wick's view, would represent corporate America in court. When questioned about his initial intent in setting up domain names, Mr. Wick responded:

Q. And what was your intention? What did you intend to do with those domain names?

A. I'm not one to sue somebody, and I—*this was my way of messing with them.*

Q. Were you going to put up web sites with those domain names?

A. Absolutely.

Q. And what were you going to put on those web sites?

A. Parody's, jokes.

.    .    .    .    .

A. ... I got to thinking, Well, who else in corporate America can I have fun with. And I figured, well, hey, you know, I got the executives pissed off as a result of me because of the names I own regarding their corporation. I can fool with them where they recreate. Well, who are they going to get to represent them? So I started getting into targeting *www.martindale.com,* large law firms.

Q. Did you intend to set up parody sites for the law firms as well?

A. Couldn't wait.

(March 30, 2000 Trans. at p. 90, 92) (emphasis added). Mr. Wick described himself as going "on a rampage" in setting up these various web sites targeting corporate America and the legal community. (March 30, 2000 Trans. at p. 91). He also described the entertainment value of purchasing the domain names: "I mean to be candid with you I mean to see these people squirming around over 70 bucks, that's enjoyable." (March 30, 2000 Trans. at p. 93). Each of these concessions manifest the degree of bad faith with which Mr. Wick established these web sites.

I conclude that, under 15 U.S.C. § 1125(d)(1)(A), Mr. Wick has violated

Morrison & Foerster's statutory rights by his use of the four at-issue domain names. The ACPA permits a court to "order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). Accordingly, I direct Mr. Wick to forfeit his interests in all four domain names (*www.morrisonfoerster.com, www.mo rrisonandfoerster.com, www.morrisonforester.com,* and *www.morrisonandforester.com* ). I then direct Mr. Wick to transfer, at his own cost, the two domain names with the correct spelling of the firm (*www.morrisonfoerster.com* and *www.morrisonandfoerster.com* ) to Morrison & Foerster. These are the domain names that Morrison & Foerster wants for firm purposes. As for the remaining domain names with the commonly misspelled firm name (*www.morrisonforester.com* and *www.morrisonandforester.com* ), I order these domain names cancelled.

I permanently enjoin Mr. Wick from taking any action to prevent and/or hinder Morrison & Foerster from obtaining these domain names. *See, e.g., Sporty's,* 202 F.3d at 500. Injunctive relief is appropriate in this case because Morrison & Foerster has established success on the merits of its claim and showed that it will suffer irreparable injury if the injunction does not issue. *See Chemical Weapons,* 111 F.3d at 1489; *Sierra Club,* 770 F.Supp. at 582. I also conclude that the injury to Morrison & Foerster, through disparagement of the firm name, outweighs whatever damage the injunction will cause Mr. Wick. *See id.* Indeed, Mr. Wick admitted at the March 30, 2000 trial that such damage, if any, would be minimal:

> Q. . . . if you are ordered to not use the four domain names in this case, could you continue to operate a website in some other domain name?
>
> A. Well, I have a number of Internet domains, so to answer your question I would have a lot of options, yes.

(March 30, 2000 Trans. p. 99). Finally, the injunction will not be adverse to the public interest but instead will further public interest by providing more accurate web site names and minimizing consumer confusion. *See id.*

## V. First Amendment Defense

At the March 30, 2000 trial, Mr. Wick argued that his use of the at-issue web sites is protected by the First Amendment because it represents parody. Under the facts of this case, I disagree. Although the content of each site may be entitled to some First Amendment protection, his use of Morrison & Foerster's trademark in the domain name of these sites is not so protected.

Primarily, I am not persuaded that Mr. Wick's web sites constitute "parody" entitled to First Amendment protection. A parody "must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody." *Hormel Foods Corp. v. Jim Henson Prod., Inc.,* 73 F.3d 497, 503 (2d Cir.1996); *OBH,* 86 F.Supp.2d at 191. Indeed, a parody depends on a lack of confusion to make its point. *See Cardtoons,* 95 F.3d at 970 ("in the case of a good trademark parody, there is little likelihood of confusion, since the humor lies in the difference between the original and the parody."); *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir.1987) ("A parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect."); *Hormel,* 73 F.3d at 503. Mr. Wick's use of the Morrison & Foerster mark in his domain names does not convey two simultaneous and contradictory messages. Instead, the names of his web sites produce confusion. Only by reading through the content of the sites could the user discover that the domain names are an attempt at

parody. Because his web sites rely on confusion to convey their points, Mr. Wick's argument that his use of the mark is a parody fails. *See OBH,* 86 F.Supp.2d at 191 ("Thus, even if users will easily recognize, upon reaching defendants' web site, that it is only a parody, the use of plaintiffs' mark as the site's domain name . . . creates initial interest confusion")

■ Moreover, because Mr. Wick's domain names merely incorporate Morrison & Foerster's trademark, they do not constitute a protectable, communicative message. *See id.* at 197 ("Whether a particular domain name is entitled to protection under the First Amendment depends on the extent of its communicative message.") (citing *Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, (2d Cir.2000)). Mr. Wick chose to use Morrison & Foerster's mark to deceive Internet users into believing they were accessing Morrison & Foerster's web site. Such use of the mark is not protected by the First Amendment. *OBH,* 86 F.Supp.2d at 197–198 ("Use of another's trademark is entitled to First Amendment protection only when the use of that mark is part of a communicative message, not when it is used merely to identify the source of a product.") (citing *Planned Parenthood Federation of America, Inc. v. Bucci,* 1997 WL 133313 (S.D.N.Y.1997)). Mr. Wick's use of Morrison & Foerster's mark as the domain name for his web sites is more analogous to source identification than to a communicative message. *See OBH,* 86 F.Supp.2d at 198. The domain names identify the web sites as being those of Morrison & Foerster. Mr. Wick offers no reason why I should determine that his domain names constitute communicative messages rather than source identifiers. I agree with the Southern District of New York judge who stated:

> The grant to one person of the exclusive right to use a set of words or symbols in trade can collide with the free speech

rights of others. *When another's trademark (or a confusingly similar mark) is used without permission for the purpose of source identification, the trademark law generally prevails over the First Amendment.* Free speech rights do not extend to labeling or advertising products in a manner that conflicts with the trademark rights of others. In these circumstances, the exclusive right guaranteed by the trademark law is generally superior to the general free speech rights of others. *See Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir.1989).

*Yankee Pub. Inc. v. News America Pub. Inc.,* 809 F.Supp. 267, 275–276 (S.D.N.Y. 1992) (emphasis added).

Finally, Mr. Wick could simply display the content of his web pages in a different location. As he testified, he has many domain names and, thus, many places to display his message. (March 30, 2000 Trans. p. 99). *Shields v. Zuccarini,* 89 F.Supp.2d 634, 640–41 (E.D.Pa.2000) ("Nor can he argue that such an order would violate his First Amendment right to free speech, as he has plenty of other outlets for his protest (i.e., just one of the three thousand domain names he owns would provide a sufficient forum).").

For these reasons, I do not credit Mr. Wick's First Amendment defense of his use of Morrison & Foerster's mark in his domain names.

## VI. Other Grounds For Relief

In addition to its claim under the ACPA, Morrison & Foerster submits seven other grounds for relief in its Complaint: Unfair Competition and False Designation of Origin in violation of 15 U.S.C. § 1125(a); Trademark Infringement in violation of 15 U.S.C. § 1114; Dilution in violation of 15 U.S.C. § 1125(c); Trademark Infringement & Unfair Competition; Intentional Interference with Current and Prospective Economic Advantage; Defamation; and

Business Disparagement. However, because I grant the requested injunctive relief with regard to its claim under the ACPA, the evidence focused on this claim, and the evidence is insufficient as to the remaining claims. I will not address further these other statutory bases for injunctive relief, other than with regard to damages. The March 30, 2000 hearing constituted a full trial on the merits. Morrison & Foerster failed to present any evidence or testimony regarding actual damages it incurred as a result of Mr. Wick's use of the domain names and web pages. Indeed, when asked, Morrison & Foerster admitted that it conducted no studies to determine whether any users of the Internet were actually confused by Mr. Wick's sites, nor did Morrison & Foerster produce any evidence of users who accessed Mr. Wick's sites rather than *www. mofo.com*. Because no such evidence was introduced, and it is a plaintiff's burden to prove damages, I decline to award any damages.

Although the ACPA contains a provision allowing for a statutory award of damages for violation, Morrison & Foerster never "elected" this remedy as required by the statute. 15 U.S.C. § 1117(d). In its complaint, Morrison & Foerster states that it is reserving its right to seek such statutory damages, but no formal election was ever made or mentioned at the trial. As a further request for relief, Morrison & Foerster requested, both in its complaint and its motion, that Mr. Wick be enjoined from using the name "Morri, Son & Foerster" and the registered trade name "Morri, Son & Foerster eBusiness, Inc." However, this argument was never addressed at the trial nor briefed. Therefore, I will not address it further.

Accordingly, it is ORDERED that:

(1) Defendants must forfeit their interests in all four domain names (*www.morrisonfoerster.com*, *www.morrisonandfoerster.com*, *www.morrisonforester.com*, and *www.morrisonandforester.com* );

(2) Defendants must transfer, at their own cost, the two domain names with the correct spelling of the firm (*www.morrisonfoerster.com* and *www.morrisonandfoerster.com* ) to Morrison & Foerster;

(3) The remaining two domain names (*www.morrisonforester.com* and *www.morrisonandforester.com* ) are cancelled;

(4) Defendants shall submit to the Court evidence of compliance with paragraphs (1), (2), and (3) of this Order within ten days from the date hereof;

(5) Defendants, their officers, agents, servants, representatives, employees, attorneys, successors, assigns, or other individuals or entities controlling, controlled by or affiliate with, and all those in privity or active concert or participation with Defendants who receive actual notice of this order, are jointly and severally PERMANENTLY ENJOINED from taking any action to prevent and/or hinder Morrison & Foerster from obtaining the subject domain names; and

(6) Morrison & Foerster is awarded its costs.