**MAYFLOWER TRANSIT, LLC, Plaintiff,**

**v.**

**Dr. Brett PRINCE, Defendant.**

**Civ.A. No. 00–5354 (JLL).**

United States District Court, D. New Jersey.

March 30, 2004.

George W. Wright, Narinder Parmer, George W. Wright & Associates, LLC., Hackensack, NJ, Mark Sableman, Elizabeth S. Eastman, Thompson Coburn LLP, St. Louis, MO, for Plaintiff.

John J. Pischeria, Dennis A. Cipriano, West Orange, NJ, for Defendant.

## OPINION & ORDER

LINARES, District Judge.

Presently before this Court are the motions for partial summary judgment by both Defendant Brett Prince and Plaintiff Mayflower Transit, LLC ("Mayflower Transit").[1] Plaintiff Mayflower Transit

1. Although Defendant does not make this entirely clear in his submissions, the Court construes his motion as one for partial summary judgment as it only refers to Plaintiff's cybersquatting, libel and trade libel claims.

filed suit against Defendant Prince alleging violations of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"), the Federal Dilution Act, 15 U.S.C. § 1125(c), and asserting claims for libel and trade libel under state law. This motion is resolved without oral argument. Fed.R.Civ.P. 78. For the reasons set forth below, Defendant's motion for partial summary judgment is granted in part and denied in part, and Plaintiff's motion for partial summary judgment is denied.

## BACKGROUND

Plaintiff Mayflower Transit is a company which provides interstate moving, shipping and storage services nationwide. MAYFLOWER is the service mark of Mayflower Transit. Plaintiff company uses affiliated agents to conduct these moves, who must undergo specific training and adhere to specific procedures mandated by Plaintiff, such as the use of particular forms, trucks, and boxes. Except in Texas and Florida, Mayflower Transit is not licensed to engage in intra-state moves; however, many of its affiliated agents can and do conduct such intra-state moves. When performing an intra-state move, an agent is permitted to use the Mayflower truck, boxes and uniforms, but is not required to do so. Mayflower Transit exercises no control over the intra-state moves of its agents nor does it have the right to monitor, control or alter the company's performance during the intra-state move. Mayflower Transit receives no financial benefit from such moves, and the state agent operates entirely in its own capacity during such moves.

On September 4, 1997, Defendant Prince contacted Plaintiff Mayflower Transit to arrange for a move from West Orange, New Jersey to Freehold, New Jersey. In making these arrangements, Defendant met with Edward Scott, who allegedly identified himself as a sales manager with Mayflower Transit. The contract for the move was, however, ultimately made with Lincoln Storage Warehouses, ("Lincoln Storage"), a New Jersey corporation. As Plaintiff explains, Lincoln Storage is an agent of Mayflower Transit solely for purposes of engaging in intra-state moves. Defendant's moving contracts bore Lincoln Storage's name and intra-state moving license number and did not mention Mayflower Transit. (Pl.Ex. B, C). The "Order for Insurance" form between Defendant and Lincoln Storage did, however, contain the Mayflower name and logo. (Pl.Ex. E).

On September 13, 1997, employees of Lincoln Storage picked up personal property from Defendant's residence, loaded them into a Lincoln Storage moving van and drove the van to the City of Orange, where it was parked overnight. The boxes and truck used in the move bore the Mayflower trademark and logo. While the van was parked overnight, thieves broke in and stole much of Defendant's property. Defendant sued Lincoln Storage and its insurance carrier in Essex County Superior Court for his losses, and the matter was settled between the parties in May 2002.

After the moving incident, Defendant registered the Internet domain name "mayflowervanlinebeware.com" and posted a website at this address describing his moving incident. The home page is headlined "Beware of Lincoln Storage Warehouse. Beware of Mayflower Van Line," and states, "If you are thinking about moving or had a bad experience moving with Mayflower Van Lines or Lincoln Storage Warehouses then please read on and reply to me at the following e-mail address: MayflowerBeware@Yahoo.com." A link to another page entitled "Don't let this happen to you" includes such language as "I honestly expected fair and reasonable treatment by Lincoln Storage Warehous-

es/Mayflower Van after their obvious negligence" and continues "Unless you're willing to risk a total loss of your possessions, do not do business with Lincoln Storage Warehouses or Mayflower Van Lines. What happened to me can and will happen to you! Don't be their next victim!" (Def.Mot.S.J., Ex. A).

In March 2000, Defendant also registered the domain names "mayflowervanline.com" and "lincolnstoragewarehous.com." Each displayed material similar to that included at "mayflowervanlinebeware.com." At some point, Defendant ceased using the domain name "mayflowervanlinebeware.com," but continued to use "mayflowervanline.com" and "lincolnstoragewarehous.com." Defendant also uses the website "newjerseymoving-company.com" and linked that domain name to the aforementioned website. In addition, Defendant has registered the website "cumberlandinsurancegrp.com," the name of the insurer involved in Defendant's claim for stolen property, but no material has been posted on that site.

Through various correspondence and telephone calls, Plaintiff informed Defendant that only Lincoln Storage, and not Mayflower Transit, was involved in his intra-state move. In response to these assertions, Defendant allegedly stated that he desired a resolution of his dispute with Lincoln Storage and would not change his website until he received a satisfactory settlement.

Plaintiff filed suit with the Court on October 30, 2000, requesting injunctive relief and damages for alleged violations of the Anticybersquatting Consumer Protection Act of 1999, 15 U.S.C. § 1125(d) ("ACPA") (Count I), trademark dilution in violation of the Federal Dilution Act of 1995, 15 U.S.C. § 1125(c) (Count II) and claims for trade libel (Count III) and libel (Count IV) under state law. Both parties seek summary judgment with respect to the cybersquatting, libel and trade libel claims. On September 8, 2003, this Court took both summary judgment motions under advisement.

## Discussion

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted only when the evidence contained in the records shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.,* 96 F.3d 66, 69, n. 2 (3d Cir.1996). In determining whether there remain any actual issues of factual dispute, the court must resolve all reasonable doubts in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden has been met, it is incumbent upon the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Thus, if the non-movant's evidence on any essential element of the claims asserted is merely

"colorable" or is "not significantly probative," the court should enter summary judgment in favor of the moving party. *Anderson,* 477 U.S. at 249–250, 106 S.Ct. 2505. In other words, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69, n. 2. Bearing in mind that the matter is presented in this particular procedural posture, the Court will now turn to the issues involved in this case.

### B. Anti–Cybersquatting Claim

Plaintiff claims that Defendant's actions violate the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A) ("ACPA"). The ACPA was enacted in an effort to stop cybersquatting, a practice defined as the "deliberate, bad-faith and abusive registration of Internet domain names in violation of the rights of trademark owners." *Virtual Works, Inc. v. Volkswagen of Am., Inc.,* 238 F.3d 264, 267 (4th Cir.2001) (quoting S. Rep. 106–140, 4). For a plaintiff to succeed on an ACPA claim, it must show that: (1) its marks are distinctive or famous; (2) the defendant's domain names are identical or confusingly similar to the plaintiff's marks; and (3) the defendant registered its domain name with the bad faith intent to profit from them. 15 U.S.C. § 1125(d)(1)(a); *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001).

In the case at bar, there is no dispute that the first two prongs of Plaintiff's ACPA claim have been met. Plaintiff's MAYFLOWER trade mark is "distinctive." Plaintiff Mayflower Transit has five separate federal registrations of the term Mayflower, which "entitles [it] to a presumption that its registered trademark is inherently distinctive." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202 F.3d 489, 497 (2d Cir.2000) (internal citation omitted); *Morrison & Foerster LLP v. Wick,* 94 F.Supp.2d 1125, 1130 (D.Colo. 2000). Moreover, Plaintiff has used the name Mayflower since 1927, and has registered the service marks as far back as 1948. *See, e.g., E. & J. Gallo Winery v. Spider Webs Ltd.,* 286 F.3d 270 (5th Cir. 2002) (finding that the fact that mark was registered 38 years ago suggests distinctiveness under ACPA).

In addition, the Court finds that Defendant's use of "mayflowervanline.com" is "confusingly similar" to the MAYFLOWER trade mark. The insertion of the term "vanline.com" does not remedy this confusion, as Plaintiff is in fact a moving van company. It is highly likely that a customer searching for Plaintiff's moving company on the Internet would be confused by this designation. *See, e.g., Shields,* 254 F.3d 476, 483 (finding confusing similarity between "joecartoon" and domain names "joescartoon.com", "joecarton.com", "joescartons.com", "joescartoons.com" and "cartoonjoe.com"); *Pinehurst, Inc. v. Wick,* 256 F.Supp.2d 424, 428 (M.D.N.C. 2003) (finding that "PinehurstResort.com" and "PinehurstResorts.com" are confusingly similar to mark of "Pinehurst Resorts and Country Club"). Indeed, in this context, "slight differences between domain names and registered marks, such as the addition of minor or generic words to the disputed domain names are irrelevant." *Ford Motor Co. v. Greatdomains.com, Inc.,* 177 F.Supp.2d 635, 641 (E.D.Mich. 2001) (internal quotation omitted).

A violation of the ACPA also requires that Defendant's actions amount to a "bad faith intent to profit." The Court's determination of whether the actions in the present case amount to bad faith is guided by the nine statutory factors enumerated in the ACPA:

> (B)(i) In determining whether a person has a bad faith intent described under

subparagraph (a), a court may consider factors such as, but not limited to

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(I). These factors are not considered exclusive or mandatory. *See, e.g., Morrison & Foerster*, 94 F.Supp.2d at 1131; *Sporty's Farm*, 202 F.3d at 498. Rather, the "most important grounds" for finding bad faith "are the unique circumstances of this case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute." *Sporty's Farm*, 202 F.3d at 499.

The first three of these factors clearly favor Plaintiff's case. Defendant had no intellectual property rights in mayflowervanline.com, the domain name does not consist of his legal name in any respect, and he has never offered goods or services under this domain name. The fifth factor likewise cuts against Defendant. Clearly, Defendant would not have chosen this domain name but for its similarity to the name of Plaintiff's company. The fact that Internet users attempting to find the web site for the Mayflower moving company might reach Defendant's sites and its critical comments instead, would undoubtedly tend to "tarnish" or "disparage" the mark and "harm the goodwill represented by the mark." For reasons already discussed, the ninth factor, concerning the distinctiveness of Plaintiff's mark, also points toward the validity of Plaintiff's claim.

On the other hand, an examination of certain factors bolster Defendant's position. Defendant did not supply false contact information when registering these

domain names (factor seven). Defendant did not make an "offer to sell" his domain name to Plaintiff and has evinced no prior practice of doing so (factor six). This Court does not believe that Plaintiff's vague allegations of Defendant's intent to use the website as a "bargaining chip" to exert settlement pressure on Mayflower constitutes an offer to sell. Once viewed in the context of Plaintiff's extreme dissatisfaction with his moving experience, and considered with the entirety of his statements on the website, Defendant's comments regarding making Mayflower "do something" about the dispute can be reasonably read as signifying his hopes that publication of criticism would induce changes in Plaintiff's future performance. Finally, this Court believes that factor eight, concerning Defendant's registration of multiple domain names, cuts both ways. Although Defendant registered several different domain names, all such registrations relate solely to the parties involved in his move and could reasonably be considered part of his wider criticism of the moving incident. This handful of interrelated registrations, all serving a common purpose of critical commentary, does not transform Defendant into a professional "squatter" who seeks to profit by capitalizing on the early registration of popular domain names.

This Court finds that an analysis of the fourth factor under bad faith—whether Defendant had a "bona fide noncommercial or fair use of the mark"—speaks to the ultimate disposition of this case, and demonstrates why Defendant cannot be held liable under the ACPA. The purpose of this element is to protect domain name registrations and users engaged in protected activities such as critical commentary. *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft,* 213 F.Supp.2d 612, 624–25 (E.D.Va.2002). This factor should be examined in tandem with the "safe harbor" in the ACPA which provides that bad faith intent shall "not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). As discussed herein, because Defendant had a "bona fide noncommercial" use of the mark, and had reasonable grounds to believe his use was lawful, Plaintiff's claim must fail.

The totality of circumstances in this case demonstrate that Defendant's motive for registering the disputed domain names and posting his criticism was to express his customer dissatisfaction through the medium of the Internet. Defendant's "cyber-griping" is a far cry from the "squatting" activity made illegal by the ACPA, in which a person purchases numerous domain names of prominent companies cheaply with the purpose of selling the domain names at a higher price to those companies. Whereas Defendant's activity may be actionable under other statutory provisions,[2] a question the Court need not decide today, it is clear that these actions do not fall within the ambit of the ACPA.

The Court concurs fully with the legal analysis and outcome of the recent Sixth Circuit decision of *Lucas Nursery and Landscaping, Inc.,* 359 F.3d 806, 2004 WL 403213 (6th Cir. Mar. 5, 2004), in which the court faced a very similar cyber-griping case brought under the ACPA. In *Lucas Nursery,* the individual defendant regis-

2. Accordingly, the Court will not delve into those cases with ostensibly similar factual circumstances that did not allege violations of the ACPA. *See e.g., Taubman Co. v. Webfeats,* 319 F.3d 770 (6th Cir.2003) (analyzing claim under § 1114 of the Lanham Act); *Planned Parenthood Fed'n of Amer., Inc. v. Bucci,* 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997) (analyzing claim under §§ 1114, 1125(a), and 1125(c) of the Lanham Act).

tered the domain name "lucasnursery.com" and created a web site in which she complained about the allegedly bad landscaping services Plaintiff company provided to her. The court rejected plaintiff's claim, stating that the "paradigmatic harm that the ACPA was enacted to eradicate—the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark—is simply not present . . ." *Id.* at *3. The court found that to find a cyber-griper such as defendant liable under this provision would "stretch the ACPA beyond the letter of the law and Congress's intention to declare anything to the contrary." *Id.* at *3.

Other courts have reached similar conclusions. In *Northland Ins. Cos. v. Blaylock,* 115 F.Supp.2d 1108 (D.Minn.2000), the defendant, angered by plaintiff's alleged unfair business practices, created a website with the name "northlandinsurance.com" to house complaints and criticisms. The court found the defendant "does not fit within 'classic' cybersquatter profile, i.e. a person who registers multiple domain names and attempts to sell them for the highest price obtainable" *Id.* at 1124. As in this case, plaintiff did not demonstrate that defendant had a bad faith intent *to profit. Id.* Likewise, in *Rohr–Gurnee Motors, Inc. v. Patterson,* 2004 WL 422525 (N.D.Ill. Feb. 9, 2004), defendant's dissatisfaction with a car he bought from plaintiff dealer led him to register "gurneevolkswagen.com" and "gurneevolkswagon.com" to detail her bad experience with the company. The court found the absence of a bad faith intent to profit and that the ACPA's safe harbor provision shielded defendant from liability. *Id.* at *5. *See also Lucent Technologies, Inc. v. Lucentsucks.com,* 95 F.Supp.2d 528, 535–36 (E.D.Va.2000) ("A successful showing that lucentsucks.com is effective parody and/or a cite for critical commentary would seriously undermine the requisite elements for [the ACPA].")

Whereas courts in this Circuit have not yet faced a suit brought against a cyber-griper under the ACPA, the defendant in *Shields v. Zuccarini,* 254 F.3d 476 (3d Cir.2001) did argue that his web sites were "protest pages" protected under the First Amendment. The court rejected this argument, not on its legal merits, but because the First Amendment griping was "a spurious explanation cooked up purely for the suit" and did not reflect defendant's true profit motives. *Id.* at 485. In contrast, Defendant's critical site in the case at bar began after his dispute with the company and did not emerge from the litigation process.

The legislative history corroborates the Court's conclusion that genuine cyber-gripers like Defendant are not covered by the ACPA. The ACPA's congressional record consistently signals the drafters' intention to target a narrow class of cyber-squatters consisting of those who have the bad faith intent *to profit,* and not to tread on the rights of those with any other motives. H.R. Rep. 106–412, 10; S. Rep. 106–40, 13; *Ford Motor Co.,* 177 F. Supp.2d at 642 (the "ACPA was designed to target persons who commandeer a domain name for no reason other than to profit by extortion, yet bypass persons with legitimate interests in the domain name.") The bad-faith statutory factors were designed specifically to "balance the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks, including for purposes such as comparative advertising, *comment, criticism,* parody, news reporting, fair use etc." H.R. Rep. 106–412, 10 (emphasis added). "[N]oncommercial uses of a mark, such as for *comment, criticism,* parody, news reporting, etc . . . . are beyond the scope of the

bill's prohibitions." S. REP. 106–40, 9 (emphasis added). "Under the bill, the use of a domain name for purposes of comparative advertising, *comment, criticism,* parody, news reporting, etc., even where done for profit, would not alone satisfy the bad-faith intent requirement." S.REP. 106–140, 14; H.R. REP. 106–412, 11 (emphasis added).

Moreover, those situations in which cyber-gripers were found liable under the ACPA are readily distinguishable. In *Toronto–Dominion Bank v. Karpachev,* 188 F.Supp.2d 110 (D.Mass.2002), a disgruntled customer's bad faith was found after he registered sixteen domain names, all of which were various misspellings of plaintiff's corporate name. Defendant Dr. Prince only possesses one domain name relating to each of the companies in his dispute. If Defendant truly desired to cover the range of like-sounding domain-names in order to extort money from Plaintiff company, as did the defendant did in *Toronto–Dominion Bank,* he could have easily registered numerous permutations of the Mayflower name. The fact that Defendant did not do so indicates the lack of bad faith. *See Lucas Nursery,* 359 F.3d 806, 810–11 (distinguishing *Toronto–Dominion Bank* based on fact that defendant "did not register multiple web sites: she only registered one.")

Plaintiff cites to *People for Ethical Treatment of Animals (PETA) v. Doughney,* 263 F.3d 359 (4th Cir.2001) for support. In that case, plaintiff registered the domain name "peta.org" in order to create a website entitled "People Eating Tasty Animals" in alleged infringement of the marks of plaintiff, a well-known animal rights group. The Court found a bad faith intent to profit because defendant made statements on his website and in the press recommending that PETA attempt to "settle" with him and "make him an offer." *Id.* at 368. These statements are fundamentally different than Defendant's comments in this case that he hoped Mayflower would "do something" about his problem, which suggest the attempt to influence through criticism rather than underhanded motives. *See Lucas Nursery,* 359 F.3d 806, 810–11 (distinguishing *PETA* because defendant did not engage in the offensive conduct of asking plaintiff to make him an offer or settle with him).

"Bad faith with intent to profit" requires more than what Plaintiff has shown in this action. To be actionable, bad faith with intent to profit need only be one of a defendant's motives for registering a domain name. *See PETA v. Doughney,* 263 F.3d at 369 (citing *Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264, 270 (4th Cir.2001)). Despite Plaintiff's attempts to portray Defendant's web sites as bargaining chips to obtain personal advantage and thereby shoehorn him into the scope of the ACPA, this Court's examination of the evidence does not find that profit-seeking was a motivating factor at all in Defendant's actions. Defendant in the present case did not clearly express his desire to sell his domain name as part of a business or express hopes that the target company would contact him for "assistance," *E. & J. Gallo Winery v. Spider Webs Ltd.,* 286 F.3d 270, 275–76 (5th Cir. 2002), nor did Defendant register the site under anything "giving rise to reasonable inference of intent to sell the domain names for profit" such as "NameIsForSale.com." *Morrison & Foerster LLP v. Wick,* 94 F.Supp.2d 1125, 1132 (D.Colo. 2000). Defendant has not registered thousands of confusingly similar web sites nor expressed a willingness to sell if "the price is attractive enough." *Northern Light Technology, Inc. v. Northern Lights Club,* 97 F.Supp.2d 96, 119–120 (D.Mass.2000). Moreover, Defendant did not sell or offer to sell anything on the web sites and the

sites contain no advertising or other avenues to obtain profits.

The Court recognizes that excluding cyber-gripers from the scope of the ACPA has the potential of "eviscerat[ing] the protections of the bill by suggesting a blueprint for cybersquatters who would simply create criticism sites in order to immunize themselves from liability despite their bad-faith intentions." S. Rep. 106–140, 9. For that reason, it is important to carefully examine the entire record, to ascertain the context surrounding the formation and use of the disputed domain name, and to scrutinize the defendant's actions for any evidence that the griping may in fact be a pretext disguising an underlying profit motive. Having undertaken such an inquiry in this case, the Court concludes that Defendant lacked the requisite bad faith intent to profit. In conclusion, as no reasonable fact finder could find that Defendant possessed the requisite "bad faith with intent to profit," he cannot be held liable under the ACPA. Accordingly, Defendant's motion for summary judgment on the ACPA claim is granted, and Plaintiff's motion for partial summary judgment on this claim is denied.

## C. Defamation

Plaintiff also claims that Defendant's website postings constitute libel actionable under state law. A corporation may recover for defamation. *See Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392, 655 A.2d 417 (1995). To prevail on its libel claim, Plaintiff must prove: (1) that Defendant made a defamatory statement of fact; (2) concerning the Plaintiff; (3) which was false; (4) which was communicated to persons other than the Plaintiff; and (5) fault. *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,* 164 F.3d 186 (3d Cir.1998) (citing *Feggans v. Billington,* 291 N.J.Super. 382, 677 A.2d 771 (App.Div.1996)). Plaintiff's burden of proof for each of the elements of defamation is by clear and convincing evidence. *Rocci v. Ecole Secondaire MacDonald-Cartier,* 165 N.J. 149, 159, 755 A.2d 583 (2000).

The Court must first examine whether Defendant's statements on his website can be considered a "defamatory statement of fact" relating to Plaintiff. Whether a statement is defamatory is a matter of law to be determined by the court. *Higgins v. Pascack Valley Hosp.,* 158 N.J. 404, 426, 730 A.2d 327 (1999). A defamatory statement is one that is "false and injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence" of others. *Romaine v. Kallinger,* 109 N.J. 282, 289, 537 A.2d 284 (1988) (internal citation omitted). In making this inquiry, the court must consider three factors: content, verifiability, and context. *Lynch v. N.J. Educ. Ass'n,* 161 N.J. 152, 167, 735 A.2d 1129 (1999); *McLaughlin v. Rosanio, Bailets & Talamo, Inc.,* 331 N.J.Super. 303, 312, 751 A.2d 1066 (App. Div.2000). A statement's content is judged by its literal meaning and what a reasonable reader would understand the statement to mean. *Lynch,* 161 N.J. at 167, 735 A.2d 1129. The "verifiability" of a statement, that is, whether the statement can be proved true or false, is also important as only verifiable statements can be defamatory, whereas opinions and name-calling which cannot be so proven are not actionable. *McLaughlin,* 331 N.J.Super. at 312, 751 A.2d 1066. Opinion statements will, however, trigger liability when they imply false underlying objective facts. *Lynch,* 161 N.J. at 167, 735 A.2d 1129; *Ward v. Zelikovsky,* 136 N.J. 516, 531, 643 A.2d 972 (1994). Finally, the context of a statement is examined because it may affect the statements's fair and natural meaning, thereby indicating whether the

statement is defamatory. *Id.* at 168, 735 A.2d 1129; *Ward,* 136 N.J. at 532, 643 A.2d 972.

■ In the case at bar, there is no dispute that Defendant's website holds Plaintiff at least partially responsible for Defendant's disastrous moving experience. Defendant warns readers to "Beware of Mayflower Van Line" and states, "Do not become the next victim of Lincoln Storage Warehouses or Mayflower Van Lines. The disaster that happened to me when I hired *them* to move my property may happen to you." (Pl.'s Ex. B, at 1) (emphasis added). After describing the details of his move, Defendant states that he "honestly expected fair and reasonable treatment by Lincoln Storage Warehouses/Mayflower Van after *their* obvious negligence." Defendant concludes, "Unless you're willing to risk a total loss of your possessions, do not do business with Lincoln Storage Warehouses *or Mayflower Van Lines.* What happened to me can and will happen to you! Don't be their next victim!" (Pl.'s Ex. B, at 2) (emphasis added).

These harsh statements are undoubtedly defamatory in nature with respect to Plaintiff. Defendant's accusations of professional incompetence and criticisms of Mayflower Transit's behavior certainly would harm its reputation among reasonable persons of ordinary intelligence. These statements could not but subject Mayflower to "a loss of the good will and confidence" of its customers and potential customers. Moreover, despite Defendant's claims to the contrary, Defendant's comments are actionable statements of fact, and not just of opinion. This is because the words used by Defendant contain certain underlying factual assertions, such as that Mayflower Transit was in fact hired by Defendant, was in fact involved in the move, and was in fact responsible for the theft of the goods.

Having found a defamatory statement of fact, the Court must now decide whether these statements were false. As mentioned, Defendant implicates Plaintiff in the move in dispute, stating that he hired both Mayflower Transit and Lincoln Storage and that it was their negligence which caused his losses. As Plaintiff notes, Mayflower Transit was *not* in fact involved in Defendant's move because Lincoln Storage serves as Mayflower Transit's agent for certain inter-state moves but not as its agent for moves that take place entirely within the state of New Jersey, as such intra-state moves are conducted solely by Lincoln Storage.

However, whether or not Mayflower Transit was directly involved in the move does not end the Court's inquiry. One can reasonably construe from the statements on the web site that irrespective of who actually performed the move, Defendant allegations imply that Mayflower Transit was *responsible* for the disputed move and that the negligent actions of Lincoln Storage could be imputed to Mayflower Transit through some form of agency relationship between them. Under this interpretation, a determination of the truthfulness of this assertion for purposes of defamation law therefore requires a brief examination of agency principles.

Agency is the fiduciary relationship in which an agent acts on behalf of his principal. *Restatement (Second) of Agency,* § 1 (1958). A principal can be found liable for the actions of an agent only when the agent acts with "authority," which may be "actual" or "apparent." *See, e.g., Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT,* 106 F.Supp.2d 606, 617 (D.N.J.1999). Even though Lincoln Storage may not have had actual authority to act on behalf of Mayflower Transit in this intra-state move, that does not preclude

the possibility that Lincoln Storage acted with apparent authority.

The doctrine of apparent authority is well recognized within the law of agency and firmly established in the State of New Jersey. *See, e.g., Shadel v. Shell Oil Co.*, 195 N.J.Super. 311, 314, 478 A.2d 1262 (Law Div.1984) (enumerating New Jersey cases on apparent authority). Under apparent authority, the manifestations of the principal to a third-party in effect create an agency relationship where one might not otherwise exist. *Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 634 A.2d 74 (1993); *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1439 (3d Cir. 1994). As set forth in the *Restatement (Second) of Agency*, § 267 (1958), the doctrine of apparent authority provides that:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by lack of care or skill of the one appearing to be a servant or other agent as if he were such.

■ Therefore, the doctrine of "[a]pparent authority imposes liability on the principal not as a result of an actual contractual relationship, but because the principal's actions have misled a third-party into believing that a relationship of authority in fact exists." *Mercer v. Weyerhaeuser Co.*, 324 N.J.Super. 290, 317, 735 A.2d 576 (App.Div.1999). To find apparent authority, one must establish that: (1) the appearance of authority has been created by the conduct of the alleged principal and not solely by the conduct of the putative agent; (2) a third party has relied on the agent's apparent authority to act for a principal; and (3) the reliance was reasonable under the circumstances. *Mercer v. Weyerhaeuser Co.*, 324 N.J.Super. at 318, 735 A.2d 576 (App.Div.1999) (internal citations omitted). A court must examine the "totality of circumstances" to determine whether an agency relationship existed even though the principal did not have direct control over the agent. *Sears Mortg. Corp.*, 134 N.J. at 338, 634 A.2d 74.

■ It has been noted that "[q]uestions of apparent authority are questions of fact and are therefore for the jury to determine." *Gizzi v. Texaco Inc.*, 437 F.2d 308, 310 (3d Cir.1971); *Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT*, 106 F.Supp.2d 606, 619 (D.N.J.1999). The factual issue that needs be resolved is whether "the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business uses, and the nature of the particular business, is justified in presuming that such agent has the authority to perform the particular act in question." *Mesce v. Automobile Ass'n*, 8 N.J.Super. 130, 135, 73 A.2d 586 (App.Div. 1950).

In the present case, the Court cannot determine as a matter of law whether apparent authority existed for the move. The putative principal Mayflower Transit does permit Lincoln Storage to use Mayflower boxes, to wear Mayflower uniforms and to use moving trucks containing the Mayflower logo. The "Order for Insurance" form between Defendant and Lincoln Storage also contained the Mayflower name and logo, presumably without objection by Mayflower Transit. Moreover, Mayflower Transit has contracted with Lincoln Storage to be its agent for all inter-state moves without attempting to clarify the intra-/inter-state agency distinction to consumers. In the absence of any such warnings to the contrary, it is eminently reasonable for the average consumer to believe that the corporate identity of his mover and the legal liability for that mover's negligence does not change once

the moving truck crosses a state border. Construing all facts in a light most favorable to Defendant, the Court cannot say as a matter of law that no apparent authority exists.

There has been case law supporting the proposition that express statements by a principal denying an agency relationship can preclude a finding of apparent authority. In *Wilzig v. Sisselman,* 209 N.J.Super. 25, 34, 506 A.2d 1238 (App.Div.1986), the court found apparent authority inapplicable in part because the third party received a letter from principal explicitly advising him that no agency relationship existed. In light of these circumstances, the court found no reasonable person could believe that an agency relationship exists. *Id.* The present case is much different than *Wilzig.* The denial of the agency relationship by the putative principal Mayflower Transit did not arise *prior* to the disputed transaction as it did in *Wilzig,* but only *after* Defendant posted his comments on the Internet. Plaintiff's denials of an agency relationship do not possess nearly the same authoritative force when the acceptance of such responsibility could lead to such negative repercussions. These suspect denials of responsibility, combined with Mayflower Transit's manifestations which ran contrary to such denials (boxes, truck, uniform, etc.), indicate that a reasonable person could believe that an agency relationship existed despite Plaintiff's statements.[3]

The existence of various indicia of an apparent agency relationship bars a finding of summary judgment on this issue. *See, e.g., Mercer v. Weyerhaeuser Co.,* 324 N.J.Super. 290, 317, 735 A.2d 576 (App. Div.1999) (alleged principal authorized agent to use its logo but issues of fact remained as to whether apparent authority existed); *Wallach v. Williams,* 103 N.J.Super. 195, 247 A.2d 17 (App.Div.1967) (evidence that oil company had represented through signs and advertising that it operated service station raised a factual issue as to company's apparent authority over station); *Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 795 (3d Cir. 1978) (under Pennsylvania law, finding that because, among other things, ostensible principal's name was contained on bags, prescription labels and receipts of franchisee, led to issues of fact concerning apparent agency); *Gizzi v. Texaco Inc.,* 437 F.2d 308 (3d Cir.1971) (reasonable persons could differ on apparent authority based on advertising, use of logo and fact that corporation acquiesced to certain noncontractual activity by agents). In sum, because a person of "ordinary prudence" could, based on the manifestations made by Mayflower Transit, be justified in believing that Lincoln Storage had the authority from Mayflower Transit to perform the move, triable issues of material fact remain concerning apparent authority. Therefore, upon viewing all the evidence and resolving all inferences in a light most favorable to Defendant, the Court cannot conclude that Defendant's statements were false as a matter of law, and summary judgment cannot be granted.

3. Plaintiff's reference to *Tucker v. Fischbein,* 237 F.3d 275 (3d Cir.2001) in no way changes this legal assessment. In *Tucker,* the court found that a reasonable jury could believe that a lawyer in a defamation suit possessed actual malice when he publicly stated in an interview that plaintiff was trying to recover for injury to her sex life, even though the legal complaint made *prior* to that interview explicitly stated otherwise. *Id.* at 284. The court stated that genuine issues of material fact existed as to this determination, just as such issues preclude summary judgment in the case at bar. Moreover, in *Tucker,* the lawyer's speech ran contrary to an incontrovertible fact (that plaintiff was not asserting a claim for sexual injuries) whereas in this case, Defendant's speech relates to a disputed characterization of the facts (whether apparent authority exists for Lincoln Storage's actions).

For the same reasons, the Court cannot find that Defendant was "at fault" as a matter of law. Once a plaintiff establishes that a defamatory statement was made, it must then prove that the defendant was at fault in publishing the defamation. *See, e.g., McLaughlin v. Rosanio, Bailets & Talamo, Inc.,* 331 N.J.Super. 303, 314, 751 A.2d 1066 (App.Div.2000) (citing *Feggans v. Billington,* 291 N.J.Super. 382, 391, 677 A.2d 771 (App.Div.1996)). If the plaintiff is a private person, he must show only that the defendant was negligent. If, however, the plaintiff is a public figure, he must demonstrate that the defendant was motivated by "actual malice"—that the defendant either knew the statement was false or recklessly disregarded its falsity. *Costello v. Ocean County Observer,* 136 N.J. 594, 612, 643 A.2d 1012 (1994) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Under New Jersey law, however, the actual malice standard also applies to private plaintiffs where the allegedly defamatory articles relate to a legitimate matter of public concern. *See Sisler v. Gannett Co.,* 104 N.J. 256, 266, 516 A.2d 1083 (1986); *Dairy Stores, Inc. v. Sentinel Publ'g Co., Inc.,* 104 N.J. 125, 135–36, 516 A.2d 220 (1986). This state law exception to the usual negligence defamation standard has been limited to "business activities that intrinsically implicate[ ] important public interests, a matter of public health—the sale of such an essential of life as bottled water—an industry heavily regulated by the government—banks." *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392, 411, 655 A.2d 417 (1995). The actual malice standard does not "extend to all consumer investigative reporting," *Id.* at 410, 655 A.2d 417, and does not generally apply "with regard to businesses like the sale and repair of lawn mowers, the repair of shoes, the cleaning of clothes, and numerous other local businesses that involve everyday products or services that do not intrinsically involve a legitimate public interest." *Id.* at 411–12, 655 A.2d 417. However, the actual malice standard will apply to *any* business regardless of its inherent importance when "charged with criminal fraud, a substantial regulatory violation, or consumer fraud that raises a legitimate public concern." *Id.* at 413, 655 A.2d 417.

The Court agrees with Plaintiff that the "actual malice" fault standard is not appropriate in this case. Defendant did not charge Plaintiff with any substantial fraud or regulatory violation that would place it into the *per se* actual malice category—rather, Plaintiff has been accused of negligence in conducting a move. Plaintiff's moving business is more naturally likened to an "everyday service" than an activity which "intrinsically involves a legitimate public interest." As far as the Court can ascertain, the moving truck industry is not "heavily regulated by the government" as is banking, nor is it an "essential of life" like the sale of water. Because Defendant makes no arguments to the contrary, the Court finds that the negligence standard is most appropriate.

Upon determining that the appropriate fault standard is negligence, the Court cannot hold that Defendant acted negligently as a matter of law in making its statements, as Plaintiff contends, or that Defendant acted non-negligently as a matter of law, as Defendant contends. There are certainly facts which tend to suggest the unreasonableness of Defendant's comments insofar as they hold Plaintiff Mayflower Transit responsible for the move. The contract for the underlying move named only Lincoln Storage as the mover and bore only Lincoln Storage's intra-state license; the estimated Costs and Services form had only Lincoln's name and address on it; both versions of the Bill

of Lading/Freight Bill bore only Lincoln Storage's name and address; and Defendant's check for payment of services was made out to Lincoln Storage. In addition, Defendant retained the Mayflower Transit statements on his website even after being explicitly told of its non-involvement. At the same time, the truck that picked up his goods and the boxes in which the goods were placed bore the Mayflower logo. In making his moving arrangements, Defendant met with a person who identified himself as a sales manager with Mayflower Transit. Moreover, it was certainly reasonable for Defendant to disbelieve the assertions of non-involvement by Mayflower's attorneys, taking place in the aftermath of a bungled move and in response to litigation and the threat of a significant damage award. Because these issues must be resolved by a trier of fact, the Court cannot find fault as a matter of law for either party.

Because summary judgment must be denied as to fault and falsity[4], the Court need not at this juncture reach the question of whether Plaintiff has shown damages as required under a prima facie defamation case. For the sake of completeness, however, the Court will briefly address the issue. A defamation action generally requires that plaintiff demonstrate damages in the form of "actual harm to reputation through the production of concrete proof." *Ward v. Zelikovsky,* 136 N.J. 516, 540, 643 A.2d 972 (1994). As such, awards based on plaintiff's testimony alone or the inference of damages are unacceptable. *Id.* (citing *Sisler v. Gannett Co.,* 104 N.J. at 261, 516 A.2d 1083 (1986)). However, if a defamatory statement constitutes libel *per se,* damages are presumed to exist and need not be shown. Libel *per se* includes those comments of "occupational incompetence or misconduct." *MacKay v. CSK Publishing Co.,* 300 N.J.Super. 599, 616, 693 A.2d 546 (App.Div.1997) (citing *Ward,* 136 N.J. at 526, 643 A.2d 972.) The comments made by Defendant, detailing "obvious negligence, ... delays, countless unreturned phone calls, etc.," warning that "[t]he disaster that happened to me when I hired them to move my property may happen to you" and that "[u]nless you're willing to risk a total loss of your possessions, do not do business with Lincoln Storage Warehouses or Mayflower Van Lines," certainly constitutes accusations of "occupational incompetence" and "misconduct." At this time, it certainly appears that Plaintiff will not need to prove special damages as the defamation in dispute fits under the category of libel *per se.*

## D. Trade Libel

Plaintiff also argues that Defendant has committed trade libel as a matter of law. Trade libel, also known as "product disparagement," derives from the cause of action for interference with contractual relations, rather than that for libel or slander. "Defamation of a corporation injures the reputation of the corporation: product disparagement injures the reputation of its products." *Dairy Stores, Inc. v. Sentinel Publishing Co., Inc.,* 104 N.J. 125, 158, 516 A.2d 220 (1986) (Garibaldi, J., concurring). Although at times a product disparagement claim may possess substantial overlap with that of libel, the "statement may be actionable under both theories." *Id.* at 134, 516 A.2d 220.

4. For clarity purposes, the Court notes that Plaintiff must prove *both* falsity and fault at trial. The two factors, though overlapping, are distinct-even if Defendant's statements are deemed false as a matter of law, he still may not have been negligent in making those false statements.

The elements of trade libel are: 1) publication; 2) with malice; 3) of false allegations concerning its property, product or business, and 4) special damages, i.e. pecuniary harm. *See, e.g., System Operations Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1140 (3d Cir. 1977); *Lithuanian Commerce Corp. v. Sara Lee*, 47 F.Supp.2d 523, 537 (D.N.J. 1999); *New Jersey Automobile Ins. Plan v. Sciarra*, 103 F.Supp.2d 388, 409 (D.N.J. 1998). A product disparagement plaintiff must show "the publication of matter derogatory to plaintiff's business in general of a kind calculated to prevent others from dealing with plaintiff or otherwise to disadvantageously interfere with plaintiff's relations with others." *Binkewitz v. Allstate Ins. Co.*, 222 N.J.Super. 501, 516, n. 8, 537 A.2d 723 (App.Div.1988).

The Court has already found that the "publication" prong has been met. Moving to the next legal element, in order to establish "malice" in a product disparagement case, Plaintiff must demonstrate that Defendant's statements were false or that they were written with reckless disregard for the truth or falsity. *Juliano v. ITT Corp.*, 1991 WL 10023, at *5 (D.N.J. Jan. 22, 1991). Unlike in the defamation context, negligence regarding the falsity of the statements is not a sufficient basis to impose liability. *See Restatement (Second) of Torts* § 623A Section d. (1977); *Neurotron Inc. v. Medical Service Ass'n of Pennsylvania, Inc.*, 254 F.3d 444, 450 (3d Cir.2001) (citing § 623A negligence standard). For the reasons stated in the context of the libel claim, Plaintiff cannot demonstrate "malice" as a matter of law. Just as reasonable finders of fact could disagree as to whether Plaintiff's statements were made negligently with respect to the libel claim, so could these factfinders disagree as to whether Plaintiff acted with malice. In addition, because of the previously-discussed issue of apparent authority, the falsity of Defendant's statements remain disputed and the Court cannot find as a matter of law that Plaintiff has met the third element of its trade libel action.

The Court must also deny summary judgment for Plaintiff because it has not asserted special pecuniary damages. Unlike ordinary defamation actions, an action for product disparagement "requires special damage in all cases. . . ." *System Operations Inc.*, 555 F.2d at 1144 (citing *Henry v. Vaccaro Const. Co. v. A.J. DePace, Inc.*, 137 N.J.Super. 512, 349 A.2d 570 (1975)). *See also Restatement (Second) of Torts* § 626 ("proof of special harm is required in all cases.") Additionally, "[b]ecause this cause of action is designed to protect the economic interests of a vendor, the plaintiff must plead and prove special damages with particularity." *Juliano*, 1991 WL 10023, at *5. As at least one court in this State has noted, the need to prove such special damages requires that Plaintiffs "allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *Id.* at *6. Moreover, if predicating its claim on a general diminution in business, plaintiff "should have alleged facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales for a [period] subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom." *Id.* Rather than making such claims, Plaintiff has only stated that because the "household moving business naturally depends upon consumer goodwill" and because of the reach of the Internet, Defendant's website "inevitably

damages Mayflower." (Pl.Mot.S.J. 14). This is not sufficient particularity to meet its prima facie case. Because it has failed to assert an essential damages element of its trade libel claim, and has failed to prove that Defendant's statements were false and done with malice as a matter of law, summary judgment for Plaintiff is denied on its trade libel claim. Because questions of fact remain, Defendant's summary judgment motion with respect to this issue is also denied.

In light of its legal discussion of the various claims, the Court also notes that Defendant's request for the imposition of sanctions under Rule 11 of the Federal Rule of Civil Procedure and the award of attorney's fees under the Lanham Act, 15 U.S.C. § 1117(a) must be denied. All of Plaintiff's "allegations and other factual contentions" possess a sufficient degree of evidentiary support in the record, Fed.R.Civ.P. 11(b)(3) and are adequately "warranted by existing law" so as to file suit. Fed.R.Civ.P. 11(b)(2). Plaintiff's arguments are neither legally nor factually frivolous. Moreover, after reviewing the record, the Court does not feel that this case was pursued in bad faith to harass or intimidate Plaintiff, but rather was initiated with the intention of remedying the alleged violation of its legal rights.

**Conclusion**

For the reasons stated herein, IT IS on this —— day of March, 2004, hereby,

ORDERED that Defendant's motion for summary judgment with respect to the Anticybersquatting Consumer Protection Act claim is GRANTED; and it is

FURTHER ORDERED that Defendant's motion for summary judgment with respect to the libel claim is DENIED; and it is

FURTHER ORDERED that Defendant's motion for summary judgment with respect to the trade libel claim is DENIED; and it is

FURTHER ORDERED that Defendant's request for sanctions and attorney fees is DENIED; and it is

FURTHER ORDERED that Plaintiff's motion for summary judgment with respect to its Anticybersquatting Consumer Protection Act claim is DENIED; and it is

FURTHER ORDERED that Plaintiff's motion for summary judgment with respect to its libel claim is DENIED; and it is

FURTHER ORDERED that Plaintiff's motion for summary judgment with respect to its trade libel claim is DENIED.

It is so ordered.